UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| CINDI L BARNES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-cv-00167-HAB |
| | ) | |
| TREDWAY POOLS PLUS INC | ) | |
| *d/b/a/* Tredway Pools Plus c/o Luke | ) | |
| Unger, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION AND ORDER</u>

Plaintiff Cindi L. Barnes ("Barnes") sued Defendant Tredway Pools Plus, Inc. ("Tredway")

for age discrimination under the Age Discrimination in Employment Act of 1967 (ADEA). (ECF

5). Before the Court is Tredway's motion for summary judgment, together with a supporting

memorandum, statement of material facts, and exhibits, filed on March 11, 2025. (ECF 20-22).

Barnes filed a response brief, response to statement of material facts, and exhibits in support on

May 9, 2025. (ECF 27, 28). Tredway replied on May 23, 2025 (ECF 29), making the motion ripe

for ruling. Having now considered the parties' arguments and evidence, Tredway's motion for

summary judgment (ECF 20) will be GRANTED.

## I. FACTUAL BACKGROUND[1]

Tredway, an Indiana business which sells spas and pool care items, hired Barnes on August

10, 2008. (ECF 27 ¶¶ 1, 34). Over time, Barnes' responsibilities with Tredway grew, as she was

promoted to Assistant Store Manager in 2011, Store Manager in 2013, and General Manager in

---

[1] For summary judgment purposes, the facts are recited in the light most favorable to Plaintiff, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

2021. (ECF 27-3 ¶ 1, 3). Throughout this time, Tredway rewarded Barnes with steady raises (*Id.* ¶ 25, 42; ECF 27-4 at 11) and increased her tasks which, by 2021, involved Barnes managing the daily operations of all three of Tredway's locations.[2] (ECF 27 ¶ 3).

In March 2023, ownership and operation of Tredway transitioned from John Denny to Luke Unger ("Unger") and Corey Berger ("Berger"). (*Id.* ¶ 2).  Prior to this ownership change, Unger and Berger met with Barnes to discuss the anticipated transition. (*Id.* ¶ 4). During their meeting Unger and Berger told Barnes "You are doing great. Keep doing what you are doing. You can retire here." (ECF 20-2 at 7; ECF 27 ¶ 4).

After the transition of ownership, the new owners gave Barnes a raise of $1,800 per year as the General Manager. (ECF 27 ¶ 6). They also created a new store manager position for the Fort Wayne North Store and promoted Nyla Ray ("Ray") (Barnes's former Assistant Manager) to that position. (*Id.* ¶ 6). As General Manager, Barnes remained the highest supervisor at Tredway (only answering to the owners) and she oversaw Ray's work since they both worked out of the Fort Wayne North Store. (*Id.* ¶ 5). Barnes believed part of her job was to direct and supervise Ray. (*Id.* ¶ 20).

However, because she had only worked a short time with the new owners, Barnes states she lacked a clear understanding of what the new owners envisioned for her in the role of General Manager. (*Id.* ¶ 31). By contrast, in his affidavit, Unger outlines the General Manager duties indicating that the General Manager was required to:

> "onboard and train staff, oversee managers on the retail side; help create the schedule with the store manager; ensure staffing levels were appropriate; order merchandise; help keep inventory up to date and keep the store clean; help create policies; conduct sales for all items in the Fort Wayne North store and above ground pools; and implement[] sales for holidays and seasons."

---

[2] These three locations are Fort Wayne North (off Lima Road), Fort Wayne South (off Jefferson Boulevard), and Warsaw. (ECF 27 ¶ 1).

(*Id.* ¶ 7; ECF 20-1 ¶ 8). Importantly, Unger emphasized the "General Manager was expected to treat all staff, customers, and the new owners with respect and professionalism." (ECF 27 ¶ 7; ECF 20-1 ¶ 8).

Following the transition of ownership, Barnes and Ray began to experience increasing tension between them at work. (ECF 27 ¶ 15). Barnes contends this tension was a result of the new owners showing Ray favoritism by giving Ray some of Barnes's job responsibilities. (*Id.*). For instance, when Ray was promoted to Store Manager she gained responsibilities like training, managing, and scheduling part-time staff in addition to her prior responsibilities. (*Id.* ¶¶ 7-8). However, the new owners also changed the structure of sales and commission. (*Id.* ¶ 11). Under the new structure, Barnes and Ray would trade off who would get to approach customers first, whereas before, Barnes would always approach first. (*Id.*). Barnes said this change took away approximately half of her sales opportunities, which generated a large part of her income. (*Id.*). When overall store sales goals were met, the structure allowed Barnes to make additional money. (*Id.* ¶ 12).

At the time of the ownership transition, Barnes was 57 years old, and Ray was 30 years old and had worked for Tredway for five or six years. (*Id.* ¶¶ 9, 13). Aside from Barnes and Ray, Tredway employed other managers of varying ages including Warsaw Store Manager (age 29), Assistant Warsaw Manager (age 76), Head Foreman (age 60), Renovation Manager (age 29), Parts Manager (age 62), and Service Manager (age 43). (*Id.* ¶ 13).

On May 22, 2023, Barnes and Ray had a work-related disagreement. (*Id.* ¶ 17). Ray was discussing with part-time employees how some were upset about who was getting paid more than the others. (*Id.*). Barnes apparently did not like these discussions and directed Ray to stop talking with employees about their pay. (*Id.*). Ray, in turn, complained to Unger that Barnes was "hostile."

3

(*Id.* ¶ 18). In an attempt to address the conflict, Unger set a meeting with Barnes and Ray to occur the following day, May 23, 2023. (ECF 20-1 ¶ 14).

After Unger left the office for an appointment, Barnes reapproached Ray. (ECF 27 ¶ 18). Ray responded, "I was told by the owner of this company that I did not have to speak to you." (*Id.*). Barnes disagreed and felt they needed to speak, but Ray told Barnes, "I don't feel comfortable talking," and repeated that the owner of the company told her she did not have to speak to Barnes. (ECF 27-1 ¶ 15). Barnes persisted and said they were "going to have a conversation." She then brought in another employee, Susie, to be a third party in the Barnes/Ray meeting. (ECF 27 ¶ 19). When Ray again refused to speak with Barnes, Barnes told Ray to leave work. (*Id.*). Ray refused to leave, and Barnes then left work. (*Id.*).

Later that day, Unger returned to the office and learned about the incident between Ray and Barnes. (*Id.* ¶ 20). He considered Barnes's involvement of Susie inappropriate, especially since he had set a meeting with Barnes and Ray for the next day. (*Id.*). He viewed this behavior as not aligning with his view of professionalism and expectations of a General Manager. (*Id.*). Barnes disputes that this was inappropriate behavior, since her job was to direct and supervise Ray. (*Id.*). Barnes contends she was never told that she handled the situation unprofessionally. (*Id.* ¶ 21).

On May 23, 2023, Unger met with Barnes separately, and then with Barnes and Ray together. (*Id.* ¶¶ 21-22). He discussed the conflict during the meeting with Barnes and Ray, and Barnes stated, "Yes I can do my job, I have been doing it for 15 years, but Ms. Ray and I are not going to work." (ECF 27-1 ¶ 12; ECF 27 ¶ 22). Unger interpreted this statement as Barnes's refusal to work to mend her working relationship with Ray. (ECF 27 ¶ 22). Barnes did not consider this meeting to be a disciplinary meeting, but one for Barnes and Ray to "iron out their difficulties so they could work together[.]" (ECF 27 ¶ 23). Unger told Barnes that Ray was permitted to move

out of the office she shared with Barnes and only speak to Barnes when it was for a customer. (ECF 27-1 ¶ 12).

Throughout this conflict, Barnes contends Ray received preferential treatment. (ECF 27 ¶¶ 22, 32). Barnes contends Ray was insubordinate in refusing to speak to her and in refusing to leave work when told. (*Id*. ¶¶ 24, 32).  Barnes believes Unger took Ray's side and did not support Barnes as she tried to discipline Ray. (*Id*. ¶ 20). Barnes believes Unger gave Ray preferential treatment because of her age. (*Id*. ¶ 32).

Unger also took issue with how Barnes referred to coworkers. (*Id.* ¶ 24). Barnes admits to referring to Ray as her "little helper," the part-time staff as "kiddos," and the owners, Luke and Corey, as "John's young nephews" or "the boys." (ECF 27 ¶¶ 24, 33). Barnes contends she was never reprimanded for this, and that it was part of the office culture. (*Id.* ¶ 33).

On May 30, 2023, Unger eliminated the General Manager position and terminated Barnes. (ECF 20-1 ¶¶ 17-18). With the General Manager position eliminated, the position's duties were distributed between Unger (age 28), Berger (age 30), Ray (age 30), and Mackenzie Muter (age 25). (ECF 27 ¶¶ 7, 25). These individuals were younger than Barnes (age 57). (*Id*. ¶ 25). "The majority of the duties for General Manager were assumed by Unger, Berger, and some duties were delegated to other managers in the business." (*Id.*).

Tredway's interrogatory response provides several reasons why Barnes was terminated. (*Id*. ¶ 38, ECF 27-3 ¶ 5). These reasons include a reputation for being difficult, bad behavior, and referring to owners as "boys" or "kids," employees voicing unhappiness with Barnes's management techniques, complaints of Barnes being disrespectful or rude, volatile behavior, not performing necessary job functions as General Manager, being unapproachable and condescending, playing favorites, poor treatment of other employees, storming out of a meeting

and refusing to talk to Ray, wanting a third party to be in on a meeting with Ray, attempting to send Ray home, and refusing to meet with Unger and Ray. (ECF 27 ¶ 3, ECF 27-3 ¶ 5). In essence, Tredway's interrogatory response claims Unger and Berger terminated Barnes for poor work performance and unprofessional conduct. (*See* ECF 27 ¶ 3, ECF 27-3 ¶ 5). Barnes claims all these reasons were fabricated and she did not receive any kind of formal or progressive discipline[3] while working for Tredway. (*Id.*).

## II.  STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005) (citation omitted).

When ruling on a motion for summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne*, 337 F.3d at 770 (collecting cases). The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Id.*

---

[3] Barnes notes that Tredway's Honesty and Integrity Policy (the "Policy") contains progressive disciplinary steps. (ECF 27 ¶ 42, *see* ECF 27-4 at 7). The Policy describes a system of "strikes" and a "warranty committee" which provides steps, depending on the scenario, which can lead to termination. (*See* ECF 27-4 at 7). Despite the apparent existence of the Policy, the parties fail to mention it nor do they advance any argument that the Policy was followed, not followed, or played any part in Barnes' termination. Perhaps this is because Tredway contends that Barnes's position was eliminated, but the Court is not required to speculate or advance arguments that could have been made by the parties.

A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* (citations omitted); *see also Ballance*, 424 F.3d at 616. However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Payne*, 337 F.3d at 771 (citation omitted); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) (instructing that in determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts" (citation omitted)).

### III. DISCUSSION

Based on the above facts, Barnes asserts that Tredway terminated her employment because of her age in violation of the ADEA. (ECF 28 at 2). She contends she was a stellar employee for years, and while doing her job, had a disagreement with the younger Ray. (*Id.* at 3-4). Despite Barnes' efforts to fulfil her role as Ray's supervisor, the owners favored Ray, and Barnes had a target on her back following the dispute. (*Id.*). Barnes contends Tredway's reasons for ending her employment were outlandish and sudden, and Tredway retained younger employees after her termination. (*Id.*). The Court addresses these contentions further below.

The ADEA provides that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). "[T]he ordinary meaning of the ADEA's requirement that an employer took adverse action because of age is that age was the reason that the employer decided to act." *Wrolstad v. CUNA Mut. Ins. Soc'y*, 274 F. Supp. 3d 894, 900 (W.D. Wis. 2017) (internal quotation marks omitted) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176

(2009)), *aff'd*, 911 F.3d 450 (7th Cir. 2018). In other words, Barnes must prove her age was the but for cause of the decision to terminate her employment. *See id.*

To show that age discrimination was the "but for" reason for the termination, a plaintiff can use either direct or circumstantial evidence. Direct evidence would be an admission that the defendant fired the plaintiff because of her age. Circumstantial evidence may include (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017). A plaintiff may, but need not, utilize the familiar *McDonnell-Douglas* burden shifting framework to organize her evidence. Regardless of methodology, the question at summary judgment remains: "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David*, 846 F.3d at 224; *see also Liu v. Cook Cnty.*, 817 F.3d 307, 315 (7th Cir. 2016) ("The proper question under either method is simply whether a reasonable trier of fact could infer retaliation or discrimination."); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014) ("[T]he fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination.").

Barnes has not alleged that there is direct evidence of discrimination; she has not alleged that the defendant has admitted to discrimination, nor has she alleged the existence of "smoking gun" evidence that directly points to her age as the reason for her termination. That means that she must use circumstantial evidence to prove her disparate treatment claim.

To defeat Tredway's motion for summary judgment, Barnes opted to use the *McDonnell Douglas* "burden-shifting framework" to organize her evidence. *McDaniel v. Progress Rail*

*Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019). Barnes may establish a *prima facie* case of age discrimination by meeting the following requirements: (1) she is a member of a protected class; (2) she was performing at a level that met her employer's legitimate expectations; (3) she was subject to an adverse employment action; and (4) she was treated less favorably than other similarly situated employees who were not members of her protected class or were younger. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 609 (7th Cir. 2012); *McDaniel*, 940 F.3d at 368. If Barnes establishes a *prima facie* case of age discrimination, Tredway must provide a legitimate nondiscriminatory reason for the action. *Fleishman*, 698 F.3d at 609. Barnes then must show that there is an issue of fact as to whether this reason is pretextual. *Id.* As emphasized above, all evidence "must be evaluated as a whole." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016).

Evaluating the facts here, it is clear (and the parties do not dispute) that Barnes meets at least two of the elements of the *prima facie* case: Barnes was 57 at the time of termination, bringing her within the protected class, s*ee Broadwater v. Heidtman Steel Prods., Inc.*, 182 F. Supp. 2d 705, 720 (S.D. Ill. 2002) (an individual over the age of 40 is within the protected age group), and Barnes was subject to an adverse employment action when she was terminated. With that acknowledgment, the second and fourth elements require additional analysis and are addressed in reverse order below.

1. *Viewing the evidence in the light most favorable to Barnes, Barnes can establish the fourth element.*

Typically, to establish the fourth element of a *prima facie* case, Barnes would need to establish she was treated less favorably than other similarly situated employees who were not members of her protected class or were younger. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Fleishman*, 698 F.3d at 609. But here, the parties treat Barnes's termination

as a mini reduction in force or "mini-RIF" rather than a standard termination. A "mini-RIF" exists when an employee's position is eliminated, the employee that performed that position is terminated, and existing staff absorb a discharged employee's duties. Thus, in the mini-RIF context, Plaintiff must show that her duties were absorbed by employees outside the protected class or by "substantially younger" employees, which the Seventh Circuit has construed to entail employees who are at least ten years younger than the plaintiff. *See Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 689-690 (7th Cir. 2006); *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 321–22 (7th Cir. 2003) ("The Seventh Circuit has defined 'substantially younger' as generally ten years younger.").

Barnes argues that her termination amounted to a mini-RIF. (ECF 28 at 4). She points to the fact that substantially younger individuals absorbed her job responsibilities, including Ray (age 30), Mackenzie Muter (age 25), and new owners Unger (age 28) and Berger (age 30). (ECF 27 at 4, 23-24). Likewise, Tredway admits, "[t]he majority of the duties for General Manager were assumed by Mr. Unger, Mr. Berger, and some duties were delegated to other managers in the business." (ECF 27 ¶ 25). Although the parties dispute the distribution of the General Manager's responsibilities, the parties agree that other, substantially younger employees absorbed these responsibilities. Viewing the evidence in the light most favorable to Barnes, she has raised a genuine issue of fact as to the fourth element of the *prima facie* case.

2. *Viewing the evidence in the light most favorable to Barnes, even if she can show she was performing at a level that met her employer's legitimate expectations, she has not demonstrated pretext.*

This leaves the second element of the *prima facie* case. To satisfy the second element, Barnes must establish she was performing at a level that met her employer's legitimate expectations. *McDonnell Douglas Corp.,* 411 U.S. at 802; *Fleishman*, 698 F.3d at 609. Tredway identifies several instances which it argues demonstrate Barnes's failure to perform in accordance

10

with its legitimate expectations—all of them stemming from the conflict between Barnes and Ray. Tredway defines one of its legitimate expectations as one "to treat all employees and the new owners with respect, especially as the General Manager for the entire business" (ECF 21 at 10) and it argues that Barnes failed to conduct herself properly. It contends that because Barnes could not act professionally, it eliminated her position in the mini-RIF and absorbed her job duties into other existing positions.

In response, Barnes points to the fact that she did not receive formal discipline such as warnings and the like for her alleged misconduct which lead to her termination. (*See* ECF 27-4 at 7 ("Honesty and Integrity Policy" describing a system of "strikes" and a "warranty committee")). Prior to that, she worked for Tredway for 15 years, received steady raises, and was told shortly before her termination that she was doing a good job and could retire from Tredway someday. But, as Tredway points out, the May incident with Ray was a game-changer.

"Where legitimate expectations and pretext overlap," as is the case here, the court "can be more efficient by addressing both together rather than first determining whether there is a *prima facie* case of discrimination and then turning to pretext." *Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022). Doing so is more in keeping with the holistic approach established in *Ortiz*. Ultimately, "the only question that matters when looking at the evidence as a whole, [is] whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [age] caused the discharge or other adverse employment action." *Brooks*, 39 F.4th at 433 (quoting *Ortiz*, 834 F.3d at 765). Under *Ortiz*, the court looks at the evidence in the aggregate to determine whether it allows an inference of prohibited discrimination. *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023).

Whatever happened in the first 15 years of employment, it is clear Barnes was involved in conflict at Tredway in May 2023, and that more recent conflict is relevant to the parties'

disagreement as to Barnes's performance. *See Mirocha v. Palos Cmty. Hosp.*, 240 F. Supp. 3d 822, 839 (N.D. Ill. 2017) (finding that working for an employer for eight years does not create an inference of meeting an employer's legitimate employment expectations). Although Barnes and Tredway characterize the conflict very differently, there are certain agreed-upon events. The parties agree, for instance, that there was tension between Barnes and Ray, and that the two struggled to work together. This began when Barnes approached Ray and told her to stop discussing pay with other employees. Ray made Unger aware of the dispute when it occurred, and Unger addressed the conflict in a meeting with Barnes and Ray the following day. When Unger met with Barnes about the incident, the undisputed evidence is that she told him, "Yes I can do my job, I have been doing it for 15 years, but Ms. Ray and I are not going to work." (ECF 27-1 ¶ 12; ECF 27 ¶ 22). Unger interpreted this statement as Barnes's refusal to work to mend her working relationship with Ray, leading to the decision to terminate Barnes's employment. (ECF 27 ¶ 22). Even viewing this statement in the light most favorable to Barnes, it is difficult to escape its meaning. Barnes says she and Ray cannot work together. Given Barnes was Ray's direct supervisor, this is a problem for the running of the business and a troubling indication of Barnes's future ability to do her job.

Barnes does not truly dispute that Unger believed Barnes's behavior towards Ray did not align with the vision of professionalism he expected from his employees. Instead, Barnes, argues that she acted in line with her job responsibilities because it was Barnes's job to direct and discipline Ray. But even if this is true, Barnes has introduced no evidence rebutting Unger's view that Barnes' acted unprofessionally. Merely disputing Unger's view of the situation is not enough. *See Mirocha*, 240 F. Supp. 3d at 839 (plaintiff "does not raise a material issue of fact on the question of the quality of [her] work merely by challenging the judgment of [her] superiors.")

(citing *Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106, 1114 (7th Cir. 1998) (explaining that plaintiff's subjective self-appraisal cannot create a genuine issue of fact regarding the honesty of employer's assessment of his performance)). Although Barnes may not think she was unprofessional or disrespectful, the question here boils down to whether Unger and Berger thought she was both, a fact that she has not rebutted with any evidence of pretext.

"To say that an employer's justification is a pretext means to say that it is a lie, specifically a phony reason for some action… [or] deceit used to cover one's tracks." *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 914 (7th Cir. 2025). (internal citations and quotation marks omitted). To meet her burden Barnes "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's asserted reasons that a reasonable person could find it unworthy of credence." *Id.* (citation and quotation marks omitted).

Barnes has not put forth any evidence to suggest Unger's assessment of her job performance was dishonest or fabricated. There are no inconsistencies or contradictions in Unger and Berger's proffered reasons for Barnes' termination. The story has remained the same: Barnes conducted her job unprofessionally after the transition of ownership. There are no weakness or contradictions in Unger and Berger's proffered reasons for Barnes' termination. This is especially true considering Barnes has agreed on several facts, including the statements and conflict detailed above, which Unger and Berger provided as reasons for termination. This agreement on the circumstances suggests Unger and Berger's reasons for Barnes termination were honestly believed, and Barnes has provided no evidence to suggest dishonesty or an effort to cover the tracks of age discrimination.

Instead, the evidence suggests that after the restructuring of the business following the transition of ownership, Barnes and Ray's working relationship unraveled. Barnes took actions

and made statements that the owners viewed as unprofessional, the owners terminated Barnes' employment. Simply put, Barnes has not raised a genuine issue of material fact that she was performing at a level that met her employer's legitimate expectations or that the employer's proffered reason for eliminating her position was a pretext for age discrimination.

Summary judgment in favor of Tredway is appropriate.

## V.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (ECF 20) is GRANTED. The Clerk is DIRECTED to enter judgment in favor of Defendant and against Plaintiff.

SO ORDERED on March 6, 2026.

s/ Holly A. Brady
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT